***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pre-trial agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee/employer relationship existed between plaintiff and defendant-employer.
3. Wachovia was a duly qualified self-insured. Cameron M. Harris Co. is currently the third party administrator in this matter.
4. Plaintiff's average weekly wage was $328.00 pursuant to the Form 60 filed in this matter.
5. Plaintiff became employed by defendant-employer in 1987. She suffered a compensable occupational disease on November 13, 1995. Specifically, plaintiff has right carpal tunnel syndrome.
6. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit #1 Notebook containing Industrial Commission Forms, Form 24 rulings, Plaintiff's medical records, vocational rehabilitation records, and documents related to Expediter;
 b. Stipulated Exhibit #2 Videotape entitled "Expediter Corp., Expanding Opportunities the Subsedentary Workplace";
 c. Stipulated Exhibit #3 Videotape entitled "Telework Job Description".
 ***********
The Full Commission adopts the findings of fact with minor modifications found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing in this matter, plaintiff was thirty-eight (38) years old. Plaintiff is a high school graduate and attended Central Piedmont Community College for two years studying advertising design. Plaintiff is divorced and her two sons live with her.
2. Plaintiff's prior work history includes two years of general office work with a temporary service performing duties such as filing, data entry, answering phones and helping customers.
3. Plaintiff became employed with defendant-employer in 1987, initially as "lockbox" processor, wherein plaintiff was responsible for handling large volume accounts, processing checks, sorting mail, keying in amounts and customer names, swiping checks and using an adding machine. Plaintiff was then promoted to Lockbox Clerk I where she processed new accounts that needed special attention. Plaintiff finally worked as an Assistant Lockbox Clerk II, wherein she attended special accounts which incidentally involved more keying of data.
4. While working as an Assistant Lockbox Clerk II, plaintiff developed problems with her right hand, including pain, numbness and swelling. These conditions were eventually diagnosed as right carpal tunnel syndrome, and defendant accepted plaintiff's condition as a compensable occupational disease through the filing of a Form 60 dated February 13, 1996.
5. At the time plaintiff contracted her occupational disease, she was earning $8.20 per hour resulting in an average weekly wage of $328.00.
6. Plaintiff was originally treated for right hand problems at Charlotte Orthopedic Specialists by Dr. Paul C. Perlik beginning in August 1995. In October 1995, plaintiff began seeing Dr. Matthew D. Ohl also at Charlotte Orthopedic Specialists. Dr. Ohl remained plaintiff's treating doctor through June 1999, after which time plaintiff apparently did not seek any further treatment for her right hand condition.
7. Dr. Ohl took plaintiff out of work in December 1995, and she has been unable to return to her position with defendant-employer.
8. Plaintiff's nerve conduction studies were normal and she has never had any surgery for her right carpal tunnel syndrome. On July 8, 1996, Dr. Ohl indicated that plaintiff had reached maximum medical improvement and released plaintiff with a five percent (5%) permanent partial disability rating for her right wrist and forearm. At this time, Dr. Ohl also placed plaintiff under permanent work restrictions of no repetitive finger or wrist extension and no prolonged grasping. On June 24, 1999, Dr. Ohl imposed an additional work restriction of no keying for longer than thirty (30) minutes.
10. At the time of the deputy commissioner hearing in this matter, plaintiff was not seeing any doctor in connection with her right carpal tunnel syndrome. Plaintiff does not currently take any prescription medication for her condition but instead takes Extra Strength Tylenol occasionally.
11. Defendant provided vocational rehabilitation services for plaintiff initially with Armstrong and Associates. After a year of vocational rehabilitation, plaintiff did not obtain employment.
12. Beginning in March 1996, defendant provided vocational rehabilitation services for plaintiff through a company called Genex. Plaintiff sent out a number of resumes, had lots of interviews and made many telephone contacts. However, after making approximately 139 contacts with potential employers, plaintiff was not offered employment with anyone.
13. On June 20, 1997, Special Deputy Commissioner Ronnie E. Rowell entered an Order denying defendant's first Form 24 application, but ordering plaintiff to fully comply with vocational rehabilitation efforts. After the entry of this order, plaintiff's vocational rehabilitation services continued. In May 1999, plaintiff returned to work for IKON Services earning over eight-dollars ($8.00) per hour in a position with duties of file duplication and inputting information into the computer. At some point, plaintiff became unable to continue this job with IKON and she went back out of work.
14. At the end of August 1999, defendant again referred plaintiff to Genex Services, Inc. for additional vocational rehabilitation and, specifically, for evaluation to determine whether she could suitably be referred to the Expediter Employment Program. Expediter is a company that assists in returning disabled individuals or individuals injured on the job to gainful employment and is based out of Pittsburgh, Pennsylvania. More specifically, Expediter seeks to "provide meaningful employment to the injured and disabled through technology-based, transitional return-to-work programs."
15. Expediter provides a program of "expedited" employment, which was ultimately offered to plaintiff in this case, through which the employee goes back to work for a new employer performing "telework", including data processing, simple surveys, polling, and market research. The telework positions secured through the expedited employment program do not involve any telephone sales. These telework positions generally involve at least 850 hours of on-the-job training provided by Expediter, and Expediter also provides assistive technology to accommodate a wide range of disabilities or injuries. These telework positions are sedentary positions requiring lifting of two pounds or less occasionally, i.e. less than five percent (5%) of the time.
16. Expediter evidently offers "sub-sedentary" work as well. According to its promotional brochure, one can assume any position while working such that even quadriplegics could do it. The brochure also indicates that even if a doctor finds one is totally disabled, one could still do this job.
17. Positions offered to injured employees through Expediter's expedited employment program are subsidized positions where the injured employee returns to work for a "bridge employer." A bridge employer is usually a larger corporation or institution that hires telecommunications employees to conduct surveys or similar work. In the case at bar, "Smart Corporation" or "Smart Telecommunications" was the bridge employer who offered employment to plaintiff through Expediter.
18. Generally speaking, prospective employees are informed at the time they fill out their applications that if they are selected for a position through the expedited employment program their employment will be subsidized. Subsidized employment means that the "time of injury employer" (in this case, Wachovia) pays all or a portion of the employee's salary while the employee works for the bridge employer learning new skills and building a record that will allow that employee to return to the workforce. If an employee's subsidy ends, the new employer (formerly the bridge employer) informs the employee whether her productivity warrants an increase or decrease in her wages.
19. In plaintiff's case, she was contacted by telephone for an interview with Expediter. Plaintiff never had face-to-face contact with anyone from the company. Plaintiff was offered the position of "surveyor" with Smart Corporation/Telecommunications, the bridge employer. Plaintiff was requested to work forty (40) hours per week, and the job was offered at a pay rate of $8.20 per hour, her exact hourly rate at the time of her injury with defendant-employer. The "subsidy company", or Wachovia/Cameron M. Harris Company, would provide all or part of plaintiff's wages for an unspecified period of time, with the hope that this subsidy would eventually be alleviated. No specific period of payment was identified, and the "subsidy" employer has the convenience of ceasing payment of the wages at any time. For example, if the subsidy company decided to stop paying the wage subsidy after 200 hours of work, the employment would probably end altogether. If the subsidy was stopped after 800 hours of work, then the bridge employer would decide whether plaintiff's productivity warranted keeping her on as an employee.
20. The duties of the surveyor position offered to plaintiff included working from home to contact prospective customers via telephone using provided customer lists to verify orders, correct or change information on the customer lists, or determine purchasing authorization. The surveyor position presumably allowed complete freedom of movement and Expediter provided all employees performing this job a hands-free telephone headset. In addition, Expediter would have provided a voice activated tape recorder to plaintiff to accommodate her right carpal tunnel syndrome. According to Leonard Felman, president and chief executive officer of Expediter, successful performance of the surveyor position would have given plaintiff the potential to move into management with Smart Corporation earning up to $10 per hour.
21. Genex forwarded a description of this surveyor position to Dr. Ohl, plaintiff's treating doctor, seeking Dr. Ohl's opinion whether this was a suitable position whose duties Ms. Griffith would be able to perform. On September 28, 1999, Dr. Ohl wrote to Genex and indicated this surveyor position was appropriate for plaintiff.
22. After receiving the offer of the surveyor position, plaintiff declined the position. Plaintiff's primary concern was the uncertain nature of the payment of salary.
23. The Commission finds that, even as ambitious as the stated goals of the Expediter company may be, and even considering its unique and creative methods utilized for returning injured workers to employment, the job offered to plaintiff is not otherwise available in the competitive job market. The competent evidence of record reveals no similar positions with comparable employment situations as offered to plaintiff that exists within the competitive job market, especially with regards to wage payment from both defendant-employer and a bridge employer and lack of job security should the defendant-employer stop subsidizing plaintiff's wages.
24. The Commission also finds that the primary thrust of the Expediter program is geared towards injured workers, and is in effect, "make-work" on a large, organized scale. Whether or not plaintiff has wage-earning capacity at the same or greater rate than that prior to injury determines whether or not disability continues for workers compensation purposes and positions wherein plaintiff's wages must be subsidized by defendant-employer in order for them to retain their new job does not constitute a meaningful return to work or proof that plaintiff has regained pre-injury wage-earning capacity. As such, the job offered to plaintiff is not suitable employment within the meaning of the North Carolina Workers' Compensation Act, and was therefore justifiably refused by plaintiff.
25. The job offered to plaintiff provides no in-state supervisor or agent of Smart Corporation that plaintiff or defendant-employer may contact regarding future issues that may arise concerning plaintiff's ability to continue with her present job given permanent work restrictions and various job modifications that may be necessitated by such. The purposes of vocational rehabilitation cannot be adequately served by an employment situation of this nature and plaintiff would be prejudiced by such an arrangement.
26. At the time of the deputy commissioner hearing in this matter, plaintiff remained totally disabled and unable to earn wages in any employment, and is therefore entitled to continued payments of temporary total disability compensation from the defendant-employer.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The job of surveyor with the Expediter company that was offered to plaintiff through vocational rehabilitation efforts with Genex is not suitable employment and was justifiably refused by plaintiff. N.C.G.S. § 97-25.
2. Plaintiff remains totally disabled and unable to earn wages in any employment, and is therefore entitled to payment of temporary total disability compensation, payable by the defendant, at the compensation rate of $218.67 per week until further Order of the Industrial Commission or until plaintiff returns to gainful, suitable employment. N.C.G.S. § 97-29.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Defendant's Form 24 Application to Terminate plaintiff's compensation is hereby DENIED.
2. Defendant shall continue paying temporary total disability compensation to plaintiff at the compensation rate of $218.67 per week until further Order of the Industrial Commission or until plaintiff returns to gainful, suitable employment.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation benefits due plaintiff is hereby approved for plaintiff's counsel. Said amount shall be deducted from the sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendant shall pay the costs.
This the ___ day of May 2002.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER